**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Southwest Fair Housing Council Incorporated, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Maricopa Domestic Water Improvement District, et al.,<br><br>Defendants. | No. CV-17-01743-PHX-DWL<br><br>**ORDER** |

Pending before the Court is Defendant Maricopa Domestic Water Improvement District's (the "District") motion for summary judgment. (Doc. 101.) Plaintiffs Tavita Peña, Jennifer Peters, and Southwest Fair Housing Council, Inc. ("SWFC") (collectively, "Plaintiffs") have asserted a single claim against the District—that the District's practice of requiring water customers living in public housing to pay a larger security deposit than the rest of the District's water customers has a discriminatory impact on members of certain protected groups and therefore violates the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.* (Doc. 40 ¶¶ 51-52.) The District argues that Plaintiffs have failed to demonstrate a prima facie case of disparate impact and forfeited the opportunity to pursue a disparate-treatment claim. (Doc. 101.) For the following reasons, the Court will grant the motion.[1]

---

[1] The District requested oral argument. That request is denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv. 7.2(f) (same).

# BACKGROUND

I.  Factual Background

The District is a non-profit special district created by Pinal County in 1986. (Doc. 1 ¶ 9; Doc. 101 at 2.) The District provides water to the town of Maricopa, as well as to some property owned by Pinal County that falls entirely within the town of Maricopa's city limits. (Doc. 101 at 2.)

Since at least 2000, the District has maintained a policy that all property owners are responsible for the costs of water services provided to their property. (*Id.*; Doc. 101-1 at 58-59.) Thus, if an owner rents a property, and the tenant leaves without paying the water bill, the property owner becomes responsible for the bill. (*Id.*) If the bill goes unpaid, the District obtains a lien against the offending property. (*Id.*)

In 2000, the District also expressed concern that "county housing has been a problem" regarding delinquent water bills. (Doc. 101-1 at 59.) "County housing" refers to public housing owned and operated by Pinal County. (Doc. 40 at 8-9.) Such housing is available "only to persons of low income and at rentals within the financial reach of such persons." (*Id.* at 9, quoting A.R.S. § 36-1409(A)(1).)

In April 2000, the District sent a letter stating that property owners would be held financially responsible for renters' delinquent water bills. (Doc. 101-1 at 60.) Because Pinal County owned the public housing serviced by the District, Pinal County was also subject to this policy. (*Id.* at 61 [letter from Pinal County acknowledging "our responsibility for delinquent water bills, incurred by our residents in Maricopa"].)

In 2002, after this change failed to alleviate the District's concerns, the District revisited the issue. (*Id.* at 62.) At that point, the District decided the best solution was to raise the security deposit charged to renters moving into public housing units. (*Id.*) The District communicated this change to Pinal County. (*Id.* at 63.)

Despite Pinal County stating that it understood its obligations, delinquency problems continued. (Doc. 101-1 at 3.) In September 2013, the District attempted to impose a policy of not starting new water service at a particular location until the previous

bill was paid, but Pinal County asked the District to continue providing water to public housing tenants and promised to "iron out the delinquency issue later." (*Id.* at 67.)

That proved difficult. In September 2013, in response to the District's suggestion that it would pursue its standard enforcement mechanism (*i.e.,* a lien on the property in question), Pinal County bluntly stated "[i]t is unlawful in Arizona to lien public property." (*Id*. at 45.) Pinal County also informed the District that "[c]ounties are political subdivisions of the State [of Arizona]" and, as such, the "anti-gift clause of the AZ constitution" prohibited Pinal County from paying the delinquent bills of its public housing residents. (*Id.* at 53.)

These developments frustrated the District, which in October 2013 sought a meeting with Pinal County to "open a dialog[ue]. . . . regarding Land owner responsibility of delinquent balances and to come to an understanding and resolution that will satisfy both parties." (*Id.* at 96.) This request went unanswered. (*Id.* at 21.)

Eventually, in April 2014, the District sent Pinal County an email detailing its grievances with how Pinal County was handling the water bills for public housing units. (*Id.* at 21-22.) The email expressed skepticism toward Pinal County's legal arguments and again sought a "resolution that will benefit our entities and . . . the potential tenants at Pinal County Housing apartments." (*Id.* at 22.)

This email did the trick, and officials from Pinal County met with District officials. (*Id.* at 27.) As a result of that meeting, "both parties concluded the [District's] Service Deposit amount for [Pinal County housing] tenants should be increased." (*Id.*) The change, effective January 1, 2015, increased to $180 the total security deposit required of public housing tenants. (*Id.* at 98.) Combined with the $20 service fee, this meant that any new resident in public housing had to pay $200 to the District upfront. (*Id.*) In contrast, non-public housing customers of the District had an upfront cost of $75—the same nonrefundable $20 service fee and a security deposit of $55. (Doc. 40 at 3.)

Through this lawsuit, Plaintiffs seek to challenge that fee increase.[2] (*Id.*) One

---
[2] The Court notes that, in Plaintiffs' response, Plaintiffs argue that three other District "rules" are also at issue in this case. (Doc. 106 at 3-4.) Given the Court's resolution of

- 3 -

Plaintiff, Ms. Peña, has lived in West Edwards Circle, one of Pinal County's public housing buildings, since 2001. In November 2016, Ms. Peña was approved to change units within West Edwards Circle. (*Id.* ¶¶ 23-24.) Like any other resident moving into a Pinal County housing unit, Ms. Peña was required to prove she had "paid for the gas, electricity, and water to be turned on in her unit." (*Id.* ¶ 23.) When Ms. Peña first moved into West Edwards Circle in 2001, the District charged her a total of $65. (*Id.*) Pursuant to the District's 2015 policy, however, Ms. Peña was charged $200. (*Id.*) This presented a "serious hardship"—Ms. Peña's rent already doubled, and now she was asked to produce a much larger security deposit than she had in the past. (*Id.* ¶¶ 24-25.) Although Ms. Peña was able to cover the moving costs, including the District's security deposit, by depleting her daughter's savings, the experience caused Ms. Peña to suffer "severe headaches and stomachaches and [she] could not sleep" and to fear becoming homeless. (*Id.*)

The other individual Plaintiff, Ms. Peters, alleges similar harms. (*Id.* ¶¶ 27-29.) Ms. Peters moved into her West Edwards Circle unit in June 2016. (*Id.* ¶ 27.) As with all tenants, she was required to prove that she had paid for all utility hookups, including water through the District. (*Id.*) This presented a problem because Ms. Peters had a limited, fixed income of $800 a month—the District's $200 fee would take a quarter of her monthly income. (*Id.*) Like Ms. Peña, Ms. Peters suffered from lost sleep, headaches, stomachaches, and a fear of becoming homeless. (*Id.*) Eventually, Ms. Peters was able to meet her financial obligations through other public assistance programs. (*Id.* ¶ 28.)

In September 2016, a case worker at Pinal County Public Housing contacted SWFHC to "express concern about [the District's] discriminatory service deposit and its effect on Pinal County's public housing residents." (*Id.* ¶ 30.) In response, SWFHC directed its "limited resources" to provide outreach and education to West Edwards Circle tenants explaining fair housing laws and discrimination. (*Id.*)

…

---

this case, it need not determine whether those rules are still in play. Plaintiffs' evidence— their statistical study—is the same for each rule.

II. Procedural History

On June 5, 2017, Plaintiffs initiated this action.[3] (Doc. 1.) They alleged the factual background outlined above and brought two claims—violations of federal and state fair housing laws—against the District. (*Id.*) Plaintiffs claimed that the District violated these laws by "discriminating on the basis of race, color, national origin, sex, familial status and disability." (*Id.* ¶¶ 34, 36.) The District filed an answer denying these allegations. (Doc. 16.)

On May 14, 2018, Plaintiffs filed an amended complaint. (Doc. 40.) In addition to the facts alleged above, the amended complaint contained a host of allegations detailing Pinal County's failure to meet its obligations under federal and state fair housing laws. (*Id.* ¶¶ 31-45.) The amended complaint realleged Plaintiffs' fair housing claims, adding Pinal County as a defendant in addition to the District, and added two new claims specifically against Pinal County—violations of 42 U.S.C. §§ 1983 and 1986. (*Id.* ¶¶ 51-58.) Pinal County filed an answer, denying Plaintiffs' claims and raising a variety of affirmative defenses. (Doc. 48.) The District filed an amended answer, again denying Plaintiffs' claims and raising affirmative defenses. (Doc. 50.) In its amended answer, the District also raised an indemnification cross-claim against Pinal County. (*Id.* at 10-13.) The District claimed that, if it were found liable on any of Plaintiffs' claims, such "liability would be caused solely or primarily by the advice and guidance that the District received from Pinal County." (*Id.* at 13.)

On August 12, 2018, Plaintiffs sought to withdraw their sole state-law claim. (Doc. 51.) The Court granted the request. (Doc. 54.)

In October 2018, the District and Pinal County filed a stipulated motion to dismiss, without prejudice, the District's cross-claim against Pinal County. (Doc. 57.) The Court also granted this motion. (Doc. 58.)

---

[3] This case was originally assigned to a magistrate judge. (Doc. 9.) After a request was made for reassignment to a district judge, the case was randomly assigned to Judge Tuchi. (Doc. 14.) It was reassigned to the undersigned judge on October 31, 2018. (Doc. 60.)

On February 15, 2019, Plaintiffs informed the Court they had reached a settlement with Pinal County. (Doc. 79.) Plaintiffs were instructed to file a notice of settlement. (*Id.*). They have yet to do so.

Discovery closed on June 28, 2019. (Doc. 88 at 2.) Afterward, the District moved for summary judgment. (Doc. 101.) Its motion seeks summary judgment on Plaintiffs' FHA claim, which is Plaintiffs' only remaining claim. (*Id.*; Doc. 40 ¶¶ 51-58.)

**LEGAL STANDARD**

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who

"fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**DISCUSSION**

The FHA prohibits discrimination on the basis of race, color, religion, sex, familial status, or national origin when making certain decisions regarding the sale or rent of a dwelling. One provision of the FHA makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling" because of a person's protected status. 42 U.S.C. § 3604(a). A different provision makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" the person's protected status. *Id.* § 3604(b).

In general, claims arising under the FHA come in two forms. "First, and most obvious, [the FHA] prohibits intentional discrimination." *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 502 (9th Cir. 2016). Such claims are known as disparate-treatment claims. *Id.* Second, the FHA also forbids "actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Id.* at 503. This theory of liability is known as disparate impact. Here, Plaintiffs have advanced the sort of statistical evidence traditionally used in disparate-impact claims, and that is the theory to which the parties dedicate most of their briefing. (Doc. 101 at 1-14; Doc. 106 at 1-15; Doc. 110 at 1-9.) Accordingly, the Court will begin its analysis with the disparate-impact claim.

I. <u>Disparate Impact</u>

The Supreme Court's 2015 decision in *Texas Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2015) ("*ICP*"), provides the starting point for assessing the contours of disparate-impact liability under the FHA. In *ICP*, the plaintiffs sought to raise, under Section 3604(a) of the FHA, a disparate-impact challenge

to a Texas housing agency's practice of "granting too many [tax] credits for housing in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods," arguing that this practice "caused continued segregated housing patterns." *Id.* at 2514. The sole issue the Supreme Court agreed to review was "whether disparate-impact claims are cognizable under the FHA." *Id.* at 2515. As part of its analysis, the Court focused on the statutory text of Section 3604(a), explaining that "the phrase 'otherwise make available' is of central importance to the analysis" because such "results-oriented language" raises an inference that Congress sought to regulate "the consequences of an action rather than the actor's intent." *Id.* at 2518. The Court also likened Section 3604(a)'s passive language to the passive statutory language ("otherwise adversely affect") found in two other statutes, Title VII and the Age Discrimination in Employment Act ("ADEA"), under which disparate impact is a recognized theory of liability. *Id.* at 2519. For these and other reasons, the Court concluded "that disparate-impact claims are cognizable under the Fair Housing Act." *Id.* at 2525.

Here, both parties assume that *ICP* paves the way for Plaintiffs to assert a disparate-impact claim against the District (Doc. 101 at 5; Doc. 106 at 5)—they simply dispute the sufficiency of the evidence. However, the claim in *ICP* arose (at least in part) under Section 3604(a) of the FHA, and the Supreme Court focused on the presence of an unusually passive and "results-oriented" phrase within Section 3604(a)—*i.e.,* a defendant may be held liable for engaging in conduct that "otherwise make[s] unavailable" a housing unit to a member of a protected class—when concluding that disparate-impact claims should be recognized under that provision. But this case doesn't appear to involve a claim under Section 3604(a)—as noted, that provision applies only when a defendant engages in conduct that *prevents* a protected-group member from renting or buying a dwelling, and both individual plaintiffs in this case acknowledge they were able to pay the increased deposit (albeit with significant difficulty). Thus, Plaintiffs' claim appears to arise under Section 3604(b), and that provision of the FHA doesn't include the "results-oriented" language found in Section 3604(a)—liability arises only when the defendant affirmatively

"*discriminate[s]* against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of" the person's protected status. 42 U.S.C. § 3604(b) (emphasis added). Thus, although the Ninth Circuit has previously held that disparate-impact claims are cognizable under Section 3604(b), *see, e.g., Ojo v. Farmers Grp., Inc.,* 600 F.3d 1201, 1203 (9th Cir. 2010), there is some question as to whether those decisions are affected by *ICP*.

In any event, because the parties assume Plaintiffs may advance a disparate-impact claim in this case, the Court will assume so, too. Disparate-impact claims under the FHA are governed by the same three-step, burden-shifting framework that is used to evaluate disparate-impact claims in other contexts. *See, e.g., ICP,* 135 S.Ct. at 2514-15 (not quarreling with the district court's application of this framework); *Ave 6E*, 818 F.3d at 513 (discussing the "burden-shifting framework for disparate-impact claims under the FHA") (citation omitted). However, the Supreme Court in *ICP* also identified several "safeguards" that must be incorporated into the burden-shifting framework. 135 S.Ct. at 2523. Those safeguards are necessary, the Court explained, because "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." *Id.* at 2518. *See also id.* at 2522 (noting that "serious constitutional questions . . . might arise under the FHA . . . if [disparate impact] liability were imposed based solely on a showing of a statistical disparity"). Thus, the Court held that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 2523. The Court labeled this "[a] *robust causality* requirement" and hinted that some lower courts had failed to properly apply it in pre-2015 decisions addressing disparate-impact liability under the FHA. *Id.* at 2523-24 (emphasis added). The Court concluded: "Courts must . . . examine with care whether a plaintiff has made out a prima facie case of disparate impact . . . . A plaintiff who fails to . . . produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.* at 2523.

In their briefs, the parties disagree about what type of statistical evidence is required to satisfy this "robust causality" requirement under the first step of the disparate-impact framework. Plaintiffs contend they are only required to show that the District's challenged policy disproportionately affected individuals who are protected by the FHA. (Doc. 106 at 5, 7.) Thus, Plaintiffs contend that the statistical analysis conducted by their expert, which shows that the households in West Edwards Circle (the public housing building where Ms. Peña and Ms. Peters both reside) are significantly more likely to be headed by an African-American, a Native American, or a female with children than the households in the District's overall service area, is sufficient. (*Id.* at 6-7, citing Doc. 106-4 at 66-73.) The District disagrees, arguing that Plaintiffs failed to meet their burden because their proffered statistics are devoid "of any opinion regarding the cause of any statistical disparities." (Doc. 101 at 7.) That is, the District asserts that the complained-of policy must "cause[] the disparity among protected groups," rather than simply showing "that a policy impacted more members of a protected class than nonmembers of a protected class." (Doc. 110 at 1, 4.)

Since *ICP* was decided in 2015, lower courts have struggled to discern what, exactly, "robust causality" means in the context of an FHA disparate-impact claim. No consensus has emerged. *See generally Inclusive Communities Project, Inc. v. Lincoln Property Co.*, 920 F.3d 890, 903-04 (5th Cir. 2019) ("Although the Supreme Court's opinion in *ICP* established 'robust causation' as a key element of a plaintiff's prima facie burden in a disparate impact case, the Court did not clearly delineate its meaning or requirements. . . . However, decisions from three other circuits—the Fourth, Eighth and Eleventh—have considered its application, yielding opinions reflecting various views of the prerequisites."). Nevertheless, this Court is required to follow Ninth Circuit law, and the Ninth Circuit's post-*ICP* decisions support the conclusion that Plaintiffs' evidence is insufficient.

The most analogous (albeit unpublished) decisions are *City of Los Angeles v. Wells Fargo & Co.*, 691 Fed. App'x 453 (9th Cir. 2017), and *City of Los Angeles v. Bank of Am.*

*Corp.*, 691 Fed. App'x 464 (9th Cir. 2017). In each case, the plaintiff asserted a disparate-impact challenge under the FHA to a bank's practice of "target[ing] low-income borrowers" with "higher-amount [mortgage] loans" that were likely to result in default. *Wells Fargo*, 691 Fed. App'x at 454-55; *Bank of America*, 691 Fed. App'x at 465.[4] In support of these claims, the plaintiff offered statistical evidence from an expert showing that "[m]inority borrowers were two to three times more likely to receive high cost or Fair Housing Act/Veteran's Affairs . . . loans than were similarly situated white borrowers." *Bank of America*, 691 Fed. App'x at 465. Nevertheless, the district court granted summary judgment to both defendants and the Ninth Circuit affirmed, holding that (1) under *ICP*, "[t]he causal link between the policy and disparity must be 'robust,' and (2) the plaintiff's statistical evidence was insufficient under this test because it "failed to demonstrate how the . . . two policies were causally connected in a 'robust' way to the racial disparity, as they would affect borrowers equally regardless of race." *Wells Fargo*, 691 Fed. App'x at 454-55; *Bank of America*, 691 Fed. App'x at 465.

Plaintiffs' evidence in this case fails for the same reason. The District has adopted a facially race-neutral policy of requiring water customers who reside in public housing to pay a higher security deposit than water customers who reside in non-public housing. Plaintiffs' statistical evidence merely shows that certain groups that are protected under the FHA are more likely to reside in public housing than in non-public housing. Although the inevitable consequence of this housing pattern is that members of protected groups will be statistically more likely to pay the increased deposit, there is nothing "robust" about this causal connection. The unfortunate reality is that membership in one of the FHA's protected groups is often correlated with low-income status, yet *Wells Fargo* and *Bank of America* both recognize that it is insufficient under *ICP* for a plaintiff asserting a disparate-impact claim under the FHA to merely show that a race-neutral policy was targeted toward those with low incomes and therefore ended up affecting a disproportionate share of

---

[4] For further background, *see City of Los Angeles v. Wells Fargo & Co.*, 2015 WL 4398858, *1 (C.D. Cal. 2015) ("According to the City, Wells Fargo engaged in discriminatory and predatory mortgage lending practices that resulted in a disparate number of residential home foreclosures for minority borrowers in Los Angeles.").

protected-group members.  *Cf. Reinhart v. Lincoln Cty.*, 482 F.3d 1225, 1231 (10th Cir. 2007) ("It is not enough for [plaintiffs] to show that (1) a regulation would increase housing costs and (2) members of a protected group tend to be less wealthy than others.").

The Fourth Circuit's decision in *Reyes v. Waples Mobile Home Park Ltd. P'Ship*, 903 F.3d 415 (4th Cir. 2018)— which Plaintiffs incorrectly proffer as a decision supporting their position (Doc. 106 at 8-9)—further supports this outcome.  In *Reyes*, a mobile home park instituted a policy of requiring all tenants over the age of 18 to provide proof of legal immigration status.  903 F.3d at 419.  A tenant who failed to do so was subject to eviction. *Id.* at 419-20.  In the ensuing FHA lawsuit, the plaintiffs alleged this policy was "disproportionately ousting Hispanic or Latino . . . families from their homes and denying them one of the only affordable housing options in [the area]."  *Id.* at 421 (internal quotations omitted).  In other words, plaintiffs brought a disparate-impact claim.  *Id.* at 420-421.  The district court dismissed that claim but the Fourth Circuit reversed.  As the court put it, "[u]nderstanding th[e] robust causality requirement is at the crux of this appeal."  *Id.* at 425.  The court concluded the plaintiffs' allegations were sufficient to establish robust causality because they "*did not merely allege that Latinos would face eviction in higher numbers than non-Latinos.  Instead, Plaintiffs satisfied the robust causality requirement by asserting that the specific Policy . . . was likely to cause Latino tenants at the Park to be disproportionately subject to eviction compared to non-Latino tenants at the Park*."  *Id.* at 429 (emphasis added).

Here, in contrast, Plaintiffs have not shown—or even attempted to show—that the protected-group members residing at West Edwards Circle would be "disproportionately" affected by the security-deposit increase "compared" to the other residents of West Edwards Circle.  Nor could they—everybody has to pay the same fee.  Rather, Plaintiffs have merely shown that the District chose to adopt a race-neutral policy at housing facilities whose population is composed of a higher percentage of protected-group members than the general population.  Under *Reyes*, that is not robust causality.  *Id.* (suggesting the disparate-impact claim would have failed had the plaintiffs "merely allege[d] that Latinos

would face eviction in higher numbers than non-Latinos").

Finally, Plaintiffs' reliance on *Hardie v. National Collegiate Athletic Ass'n*, 876 F.3d 312 (9th Cir. 2017), fails for similar reasons. *Hardie* involved a disparate-impact challenge to an NCAA rule that excluded anyone with a felony conviction from coaching at an NCAA-certified youth athletic tournament. *Id.* at 315.[5] In support of this challenge, the plaintiff offered statistical evidence showing that "46.5% of those approved under the [rule] were African American, while 80.1% of those denied because of a felony conviction were African American." *Id.* at 318. The plaintiff also offered statistical evidence showing that "African American applicants represented 40.3% of applicants denied because of a felony conviction, compared to 26.5% of approved applicants, meaning that African Americans were represented among felony-denied applicants at a rate 1.52 times higher than among approved applicants." *Id.* The Ninth Circuit concluded this evidence was sufficient under the first prong of the disparate-impact test and *ICP* because it "establishes a 'causal connection' between the Participant Approval Policy's blanket felon ban and the disproportionate effect on African American coaching applicants." *Id.* at 321.

Plaintiffs' statistical evidence in this case is nothing like the evidence in *Hardie*. Here, 100% of protected-group members who reside at West Edwards Circle must pay the increased security-deposit fee, but 100% of the other residents must pay the fee, too. Everybody is treated the same, and experiences the same outcome, regardless of membership in a protected group. To find liability under the FHA in this circumstance would turn the concept of "robust causality" on its head and ignore *ICP*'s exhortation that "serious constitutional questions . . . might arise under the FHA . . . if [disparate impact] liability were imposed based solely on a showing of a statistical disparity." 135 S.Ct. 2522.[6]

---

[5] The disparate-impact challenge in *Hardie* arose under Title II of the Civil Rights Act of 1964, not under the FHA, but the Ninth Circuit cited *ICP* and applied its "robust causality" requirement. *Hardie*, 876 F.3d at 319-20.

[6] Plaintiffs also cite cases decided between 1977 and 2005 that address disparate-impact liability under the FHA (Doc. 106 at 7-8), but those cases were decided before *ICP* and do not incorporate its "safeguards" or its robust causality requirement.

II. <u>Disparate Treatment</u>

In their response, Plaintiffs argue that, in addition to their disparate-impact claim, they have "submitted sufficient evidence to withstand summary judgment on their disparate treatment claim." (Doc. 106 at 16.) The District argues, however, that there is no disparate-treatment claim in this case—Plaintiffs have neither alleged nor pursued such a claim throughout this litigation. (Doc. 110 at 9.) Even if such a claim exists, the District argues, Plaintiffs have failed to meet their burden.

As noted, the FHA allows for both disparate-treatment and disparate-impact claims. *Ave. 6E Invs.*, 818 F.3d at 502-03. That does not mean, however, that a plaintiff may proceed under both theories if only one is alleged in the complaint. In *Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000), three plaintiffs brought claims under the ADEA. *Id.* at 1280. In their complaint, the plaintiffs alleged a disparate-treatment theory but not a disparate-impact theory. *Id.* When the plaintiffs tried to raise a disparate-impact claim at summary judgment, the district court dismissed it, relying on the fact that it hadn't been raised in the complaint. *Id.* The Ninth Circuit affirmed, reasoning that allowing the plaintiffs to raise a new theory of liability at summary judgment would prejudice the defendant. *Id.* at 1292, 1294. The court emphasized that the two theories require "entirely different defenses," so a lack of notice as to one theory would "make[] it difficult, if not impossible, for [a defendant] to know how to defend itself." *Id.* at 1292. Thus, the court held that plaintiffs who clearly state one theory of liability in their complaint, but seek to utilize the other, are "required either (1) to plead the additional [theory] in their complaints, or (2) to make known during discovery their intention to pursue recovery on the [other theory] omitted from their complaints." *Id.* at 1294.

Disparate-impact and disparate-treatment claims are generally handled the same from one statutory context to the next. *Hardie*, 876 at 319 n.8. The Court sees no reason the rule announced in *Coleman* would not apply here. *Cf. Elliott v. QF Circa 37, LLC*, 2018 WL 29933467, *13 n.13 (S.D. Cal. 2018) (denying plaintiff the opportunity to pursue a disparate-treatment claim under the FHA because it was not raised in the complaint);

*Keller v. City of Fremont*, 2012 WL 12884555, *1 (D. Neb. 2012) (denying plaintiff's attempt to rely on a disparate-impact theory under the FHA because it was not raised in the complaint). *See also Ave 6E Invs.*, 818 F.3d at 503-04 (reversing dismissal of disparate-treatment claims only because "the second amended complaint contains sufficient allegations that the [defendant's] decision was driven by animus"). Thus, under *Coleman*, Plaintiffs are foreclosed from pursuing a disparate-treatment claim at this stage of the litigation. Plaintiffs' complaint makes specific mention of a disparate-impact claim. *Compare* Doc. 40 ¶ 21 ("As a result of the demographics of public housing in [the District's] service area and Pinal County, a service deposit fee policy that requires public housing residents to pay a fee three times higher than the fee paid by non-public housing residents actually and predictably result in discrimination.") *with* 24 C.F.R. § 100.500(c)(1) (in a discriminatory effects case, the plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect."). In contrast, the complaint is devoid of any allegation that discrimination against a protected class member was a "motivating factor" behind the District's challenged policy change, which is an essential element of a disparate-treatment claim. *Ave. 6E Invs.*, 818 F.3d at 503-504. The complaint, then, showed an intent to pursue a disparate-impact claim but not a disparate-treatment claim. Similarly, it does not appear that, in the course of discovery, Plaintiffs gave any indication that they would pursue a disparate-treatment claim in addition to their disparate-impact claim.

Finally, although the Court need not reach the issue, the evidence Plaintiffs cite in support of their disparate-treatment claim appears insufficient to establish a genuine dispute of material fact. The strongest evidence Plaintiffs cite is that one of the District's board members stated he didn't "think [Pinal County was] as accountable as they should have been for their property, for managing the influx of people and tenants and that type of thing." (Doc. 106-6 at 122.) Plaintiffs ascribe discriminatory meaning to this statement, but standing alone, it is not the sort of "code word" that demonstrates discriminatory intent. *Ave. 6E Invs.*, 818 F.3d at 505-06. Whether a code word demonstrates intent depends on

"local custom and historical usage," evidence that is absent from the record. *Id.* Without more, it is unlikely Plaintiffs' disparate-treatment claim would survive summary judgment on the merits.

Accordingly, **IT IS ORDERED** granting the District's motion for summary judgment. (Doc. 101.) Because Plaintiffs have indicated they have settled with Pinal County, there are no remaining claims in this case. Therefore, the Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 21st day of February, 2020.

Dominic W. Lanza
United States District Judge